# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

<table>
<tr><td>THE STATE OF WASHINGTON,</td><td>)</td><td>No. 74438-1-I</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Respondent,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>DIVISION ONE</td></tr>
<tr><td>v.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>THERESA GAIL SCANLAN,</td><td>)</td><td>PUBLISHED OPINION</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Appellant.</td><td>)</td><td>FILED: March 12, 2018</td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

2018 MAR 12 AM 9: 33

COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED

MANN, J. — Theresa Scanlan appeals her convictions for assault in the second degree, felony violation of a court order, and unlawful imprisonment of Leroy Bagnell, her domestic partner. Scanlan contends that (1) the trial court erred in admitting testimonial statements made by Bagnell to medical treatment providers, (2) there was insufficient evidence to support the charge of unlawful imprisonment, and (3) her convictions for both felony violation of a no-contact order and assault in the second degree were based on the same course of conduct and violate double jeopardy.

We hold that because the primary purpose of Bagnell's statements to his treatment providers was for medical treatment, the admission of the statements did not violate Scanlan's rights under the confrontation clause. We further conclude that there was sufficient evidence to support Scanlan's conviction for unlawful imprisonment. We

therefore affirm Scanlan's convictions for assault in the second degree and unlawful imprisonment. However, we accept the State's concession and reverse Scanlan's conviction for felony violation of a no-contact order. We remand for resentencing on the crimes of assault in the second degree, unlawful imprisonment, and misdemeanor violation of a no-contact order.

## FACTS

In 2013, Bagnell, an 82-year-old widower, was living independently in the Federal Way home that he had shared with his wife of more than 50 years. Sometime in 2013, Bagnell met Scanlan, a woman 30 years his junior. They quickly became friends and about two months later, Scanlan moved in with Bagnell.

On October 16, 2014, the Federal Way Police Department responded to Bagnell's home after receiving a 911 hang-up call. The officers found Bagnell and Scanlan inside the home. Scanlan was uninjured, but Bagnell, who was dressed in a t-shirt and underwear, had wounds on his head, arms, and legs. After questioning Scanlan, the officers arrested her. As a result of the incident, a court order was issued prohibiting Scanlan from contacting Bagnell.

A few weeks later, on November 6, 2014, Bagnell's adult children grew concerned after Bagnell missed a scheduled meeting with them. After trying and failing to reach him on his cell phone and home phone, Bagnell's children went to Bagnell's house to check on him.

When Bagnell's children arrived at his house, they found it dark. Its blinds were drawn and all of the interior and exterior lights were out. The children thought this was odd and moved up to the front porch to try to see inside. From the porch they could see

the glow of the television and shadowy movements. They rang the doorbell and knocked but received no answer. Bagnell's children were alarmed and opened the door with an emergency key.

Inside, they found Bagnell's home in disarray. Trails of blood ran across the carpet and up the stairs, gouges marked the walls, and broken household items and debris lay on the floor. A golf club leaned against a wall, and a hammer lay on a coffee table. A crowbar was on the dining room table, and a broken broom handle stood in a garbage bucket in the middle of the family room's floor. Bagnell sat alone in a chair in the family room, dazed, bleeding from several wounds, and severely bruised such that "[h]is face was black." Bagnell at first appeared to be unconscious, but he began to respond to their attempts to rouse him as they called 911.

Roughly 15 minutes later, Federal Way Police Officer Brian Bassage arrived at Bagnell's home. Just as Officer Bassage arrived, Scanlan was found hiding under a blanket in the front seat of a car in the garage. As Officer Bassage removed her from the car, Bagnell's daughter yelled out at her that she had "just beat her father half to death, that there was blood everywhere." Scanlan shouted back, "It's not that bad."

At the police station, Scanlan claimed to be injured. The police took pictures, but did not detect any significant injuries. Scanlan did not receive medical treatment.

Bagnell was transported to the hospital where he was treated in the emergency room for his injuries which included: extensive bruising all over his body, four large open wounds on his legs, wounds on his arms, and fractures on both hands. Bagnell was treated in the emergency room on November 6 by emergency room Nurse Catherine Gay and Dr. Robert Britt. Bagnell also met with social worker Jemina Skjonsby. After

treatment, but prior to his release, Bagnell met with Federal Way Police Department Detective Adrienne Purcella from about midnight to 1:00 a.m. Bagnell signed a form medical records waiver at 12:55 a.m.

Bagnell did not testify at trial. However, the trial court admitted statements that Bagnell made to medical providers in the emergency room, as well as subsequent statements made to his primary care physician and wound care medical team.

In November 2015, the State charged Scanlan with assault in the second degree (count 1), felony violation of a court order (count 2), unlawful imprisonment (count 3), and assault in the fourth degree (count 4). All counts contained a domestic violence allegation. The jury found Scanlan guilty of assault in the second degree, felony violation of a court order, and unlawful imprisonment. Scanlan appeals.

ANALYSIS

*Right to Confrontation*

Scanlan contends first that her right to confront the primary witness against her was violated. She argues that the trial court erred in admitting testimonial statements made by Bagnell to medical providers and two law enforcement officers.

A.     Testimony of Medical Providers

The trial court allowed testimony from five medical providers concerning statements that Bagnell made to them during the course of treatment.

Nurse Gay was the first person to speak with Bagnell. Gay testified that when she asked Bagnell how he was injured, Bagnell told her that "his girlfriend had beaten him up, and that he'd had a no-contact order with that individual." Gay testified that when she asked Bagnell why his neck had a "ring mark around the back of [it]," Bagnell

-4-

told her that "his girlfriend had . . . tried to strangle him with his sweatshirt and had pulled the sweatshirt so hard, it had left this permanent ring around the back of his neck." Gay clarified during cross-examination that Bagnell had not used the word "strangled."

Dr. Britt, the emergency room doctor who treated Bagnell, testified that when he asked Bagnell what happened, Bagnell responded that he had been imprisoned in his home for two days:

> [Dr. Britt]: The patient did state that he had been in his home for two days, that he had been imprisoned, or at least held in his home against his will. He did state that he hadn't really eaten in a couple of days. He wasn't allowed to talk to his family.
>
> [State]: And did he tell you about how he sustained his injuries?
>
> [Dr. Britt]: He said that he was hit with fists, that he had been bitten in a couple of places and that he had been hit with a broom.

After Bagnell was medically cleared at about 9:00 p.m., an emergency room social worker named Jemina Skjonsby met with him. Skjonsby testified that when she asked him why he felt okay to return home, Bagnell told her "[t]hat he was relieved that this person had been removed from the home by police and that he wouldn't have to worry about it again."

On November 13, Bagnell met with his primary care physician Dr. Curtis Endow to follow up on his earlier injuries. Dr. Endow testified he observed that Bagnell had "[b]ruises, and swelling over the face, bruises over the upper chest, lower trunk and legs, and in the extremities, multiple bruising and open wounds in various levels of—or depth of degree." Dr. Endow testified that as part of his treatment he asked Bagnell how he had been injured and that Bagnell responded that "he received the injuries

during an assault" and that his girlfriend had assaulted him. Dr. Endow referred Bagnell to a wound care clinic for follow up care.

On November 18, Bagnell met with Stacy Friel, a physician's assistant at the wound care clinic, about his wounds. Friel examined multiple wounds, including one wound on Bagnell's left arm, two wounds on his right arm, one wound on his right leg and three wounds on his left leg. Friel testified that as part of her treatment she asked Bagnell how he was injured and that he responded that he "was living with a girlfriend at the time who had locked him in a room and had beat him with a candlestick, a broom, and a hammer over multiple areas."

On November 26, 2017, Bagnell returned to the wound care clinic to see Dr. Jessica Pierce. As part of her treatment, Dr. Pierce asked Bagnell how his injuries happened. She testified that Bagnell told her his injuries were "a result of domestic violence," that "he was hit with a candlestick, a broom," and that he was "punched or hit [with] . . . a hammer, something hard."

B.    The Primary Purpose Test

A confrontation clause challenge is reviewed de novo. State v. Koslowski, 166 Wn.2d 409, 417, 209 P.3d 479 (2009).

"The Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" Koslowski, 166 Wn.2d at 417 (alterations in original) (quoting U.S. Const. amend. VI.) "[T]he Sixth Amendment's right of an accused to confront the witnesses against him . . . is made obligatory on the States by the Fourteenth Amendment." Pointer v. Texas, 380 U.S. 400, 403, 85 S. Ct. 1065, 12 L. Ed. 2d 923 (1965). The confrontation clause prohibits

the "introduction of testimonial statements by a nontestifying witness, unless the witness is 'unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" Ohio v. Clark, ___ U.S. ___, 135 S. Ct. 2173, 2179, 192 L. Ed. 2d 306 (2015) (quoting Crawford v. Washington, 541 U.S. 36, 54, 124 S. Ct. 1354, 158 L. Ed. 2d. 177 (2004)).

Neither Scanlan nor the State dispute that Bagnell was unavailable to testify or that Scanlan had no prior opportunity to cross-examine him. The central issue, therefore, is whether the admitted statements were testimonial.

Scanlan urges that we follow the three-part test for determining when statements made to medical providers are testimonial set out in State v. Sandoval, 137 Wn. App. 532, 537, 154 P.3d 271 (2007), and followed in State v. Hurtado, 173 Wn. App. 592, 600, 294 P.3d 838 (2013). Statements in this context are nontestimonial when the following factors exist: "(1) where they are made for diagnosis or treatment purposes, (2) where there is no indication that the witness expected the statements to be used at trial, and (3) where the doctor is not employed by or working with the State." Sandoval, 137 Wn. App. at 537. Scanlan argues that because Bagnell signed medical record waivers prior to making his statements to medical providers he had an expectation that his statements would be used at trial and are therefore testimonial. We disagree.

As we have previously recognized, confrontation clause jurisprudence has been in rapid flux since the U.S. Supreme Court's 2004 decision in Crawford. See State v. O'Cain, 169 Wn. App. 228, 234-35, 289 P.3d 926 (2012) (acknowledging "uproar" in confrontation clause jurisprudence); State v. Robinson, 189 Wn. App. 877, 882-92, 359, P.3d 874 (2015) (applying recent United States and Washington Supreme Court

jurisprudence to testimony of a 911 call). Most recently, in Clark, which was issued

after both Sandoval and Hurtado, the United States Supreme Court made clear that:

> under our precedents, a statement cannot fall within the Confrontation
> Clause unless its primary purpose was testimony. "Where no such primary
> purpose exists, the admissibility of a statement is the concern of state and
> federal rules of evidence, not the Confrontation Clause."

Clark, 135 S. Ct. at 2180 (quoting Michigan v. Bryant, 562 U.S. 344, 359, 131 S. Ct.

1143, 179 L. Ed. 2d 93 (2011)). We hold, therefore, that the proper test to apply in

determining whether the statements made to medical providers are testimonial is the

"primary purpose" test.[1] .

In Crawford, the United States Supreme Court explained that "witnesses" under

the confrontation clause are those "who bear testimony" and defined "testimony" as "a

solemn declaration or affirmation made for the purpose of establishing or proving some

fact." 541 U.S. at 51 (internal quotation marks and alterations omitted). The Court

concluded in Crawford that statements by a witness during police questioning at the

station house were testimonial and could not be admitted. The Crawford court did not,

however, offer an exhaustive list or definition of testimonial statements. Crawford, 541

U.S. at 68.

In 2006, the Supreme Court further defined testimonial statements in Davis v.

Washington and Hammon v. Indiana, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224

(2006), two cases that it decided together. Both cases addressed statements given to

law enforcement officers by victims of domestic abuse. Davis addressed statements

---

[1] We note, that at least in dicta, the United States Supreme Court has characterized statements made to medical providers for purposes of diagnosis or treatment as nontestimonial. Bryant, 562 U.S. at 362 n.9; Melendez-Diaz v. Massachusetts, 557 U.S. 305, 312 n.2, 129 S. Ct. 2527, 174 L.Ed.2d 314 (2009); Giles v. California, 554 U.S. 353, 376, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008).

made by a victim to a 911 operator during, and shortly after, a boyfriend's violent attack. In contrast, Hammon concerned statements made by the victim to police after being isolated from her abusive husband. Davis, 547 U.S. at 820. The Court held that the statements in Hammon were testimonial, while the statements in Davis were not. In doing so, the Court announced the "primary purpose" test and explained:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Davis, 547 U.S. at 822. Because both cases addressed statements made to law enforcement officers, the Court expressly reserved the question of whether similar statements made to individuals other than law enforcement officers raised similar issues under the confrontation clause. Davis, 547 U.S. at 823.

In 2011, the United States Supreme Court expounded on the primary purpose test in the law enforcement context in Bryant. "[T]he relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." Bryant, 562 U.S. at 360. When "the primary purpose of the interrogation is to respond to an ongoing emergency, its purpose is not to create a record for trial and thus is not within the scope of the [Confrontation Clause]." Bryant, 562 U.S. at 358. But "the existence vel non of an ongoing emergency is not the touchstone of the testimonial inquiry."

Bryant, 562 U.S. at 374. Instead, "whether an ongoing emergency exists is simply one factor—albeit an important factor—that informs the ultimate inquiry regarding the primary purpose of an interrogation." Bryant, 562 U.S. at 366.

Another factor is the informality of the situation and interrogation. And, again, while formality is not the "sole touchstone" of the primary purpose test, "informality does not necessarily indicate the presence of an emergency or the lack of testimonial intent." Bryant, 562 U.S. at 366. In the end, the question is "whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" Clark, 135 S. Ct. at 2180 (quoting Bryant, 562 U.S. at 358).

In Clark, the Supreme Court was presented with the question it had repeatedly reserved: "whether statements to persons other than law enforcement officers are subject to the Confrontation Clause." Clark, 135 S. Ct. at 2181. In Clark, the Court considered whether statements made by a three-year-old child to his preschool teacher were testimonial. The child's teacher noticed injuries on the child and asked him what happened. Clark, 135 S. Ct. at 2178. The child indicated that Clark had caused the injuries. The teacher called a child abuse hotline and reported the suspected abuse. Clark, 135 S. Ct. at 2178.

Clark was charged with multiple counts of assault and endangering a child. Clark, 135 S. Ct. at 2178. The child did not testify at trial but the trial court allowed the State to introduce the child's statements to the teacher. Clark, 135 S. Ct. at 2178. The Supreme Court held that the child's statements were not testimonial, and that their

admission without cross-examination of the child did not violate the confrontation clause. Clark, 135 S. Ct. at 2183.

In reaching its decision, the Supreme Court declined to adopt a black letter rule that statements to individuals that are not law enforcement officers are outside of the Sixth Amendment. Clark, 135 S. Ct. at 2182. The Court explained, however, that the person that the victim is speaking to remains highly relevant and that:

> Courts must evaluate challenged statements in context, and part of that context is the questioner's identity. Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers. It is common sense that the relationship between a student and his teacher is very different from that between a citizen and the police. We do not ignore that reality. In light of these circumstances, the Sixth Amendment did not prohibit the State from introducing L.P.'s statements at trial.

Clark, 135 S. Ct. at 2182 (internal citations omitted).

C.    Application to Statements to Medical Providers

Applying Clark and the primary purpose test to Bagnell's statements to his medical providers supports the trial court's conclusion that the statements were not testimonial. The primary purpose of the statements was to obtain proper medical care for his injuries.

Bagnell's statements were not made to law enforcement officers, and law enforcement officers were not present during any of Bagnell's statements to his medical providers.[2] Bagnell's statements were further made in the relatively informal setting of

---

[2] In Hurtado, which this court decided prior to the United States Supreme Court's decision in Clark, we found that statements made to medical providers while a police officer was present and actively gathering evidence violated the defendant's Sixth Amendment right to confront his witnesses. But because properly admitted evidence overwhelmingly established the defendant's guilt, we concluded that the error was harmless. Hurtado, 173 Wn. App. at 597, 608.

the emergency room and treating doctors' offices, not at the police station or an interrogation room. See Davis, 547 U.S. at 820 (statements made to police in a "battery affidavit"); Crawford, 541 U.S. at 65-66 (statements made by witness during police questioning at the station house were testimonial). And while Bagnell's life was not in immediate danger, he had extensive bruising, wounds, and fractures that required treatment in the emergency room for several hours along with follow up treatment by his primary care physician and the wound care clinic.

Further, each of the medical providers testified that their questioning of the cause of Bagnell's injuries was important to their medical treatment. Nurse Gay explained that knowing how an injury occurred is important for managing the patient's care in the hospital and determining property treatment, discharge, and follow up. Dr. Britt testified that it was important to determine the mechanisms of injuries in treating a patient. For example, a bite from a human would be treated differently from a bite from a dog. He explained further that the cause of injuries determines the patient's medical needs, and is important in formulating a discharge plan for safely releasing a patient from the hospital and determining whether a social worker is necessary. Skjonsby testified that knowing how a patient was injured is important for providing the correct social work services and a safe discharge.

Dr. Endow testified that it was important for treatment purposes to determine how Bagnell's injuries occurred and whether they had been caused by fainting, falling, or by some other mechanism. Dr. Endow also needed to determine if an elderly patient like Bagnell was safe to return home. Dr. Pierce testified that wound care requires a comprehensive evaluation of the patient. Dr. Pierce explained that emotional status

-12-

plays an important role in the healing process and that depression can be a problem. He explained further that the mechanisms of the injury plays an important role in choosing proper treatment when wounds are not healing properly. For example, if the patient has fallen, the risk of future falls must be assessed and treated.

Scanlan's right to confrontation was not violated by the testimony of Bagnell's medical providers because the medical providers' primary purpose in asking Bagnell how he was injured was not to create an out-of-court substitute for trial testimony. The medical providers' primary purpose in asking Bagnell, a severely injured elderly man, about how he was injured was to diagnose his injuries and treat them. When Bagnell arrived at the hospital, he was "bruised from head to toe, bleeding from several skin tears," and had "a couple of deformit[ies] of the hands." Faced with this situation, any medical provider would ask the patient what happened in order to treat the patient properly. The primary purpose of describing how a patient is injured is to inform the medical provider about the nature and extent of the injuries. Viewed objectively, no medical provider in this situation would be primarily concerned with "creat[ing] an out-of-court substitute for trial testimony." Clark, 135 S. Ct. at 2180 (quoting Bryant, 562 U.S. at 358).

Scanlan counters that the medical waivers Bagnell signed would have made a reasonable declarant aware that his statements made to medical providers would be used in a future trial. But the medical waivers are irrelevant to the primary purpose of why Bagnell was speaking with the doctors. The primary purpose of Bagnell's interactions with his medical providers was for treatment and diagnosis. Under Clark's primary purpose test, the secondary purpose is irrelevant. Clark, 135 S. Ct. at 2183 ("It

-13-

is irrelevant that the [preschool] teachers' questions and their duty to report the matter had the natural tendency to result in Clark's prosecution.").

In sum, the medical providers' testimony of what Bagnell told them was nontestimonial because the primary purpose of the conversation was for treatment and diagnosis. Bagnell's statements to his medical providers were not testimonial and were properly admitted.

D.    Statements to Law Enforcement Officers

Scanlan argues further that Bagnell's statements elicited through Officer Giger and Detective Purcella's testimony were testimonial statements.

On November 6, Officer Giger responded to Bagnell's house after Scanlan's alleged assault. Giger testified that while assessing the scene she asked Bagnell if Scanlan hurt him:

> [Officer Giger]: Okay. I asked [Bagnell] if Theresa [Scanlan] had done that to him.
>
> [State]: Okay. Did he provide you an answer to that question?
>
> [Officer Giger]: Yes.

Here, Officer Giger's statement is testimonial because when viewed objectively, the primary purpose of a police officer's question in this scenario would be to gather evidence for trial and "creat[e] an out-of-court substitute for trial testimony." Bryant, 562 U.S. at 358. There was no emergency at this point because Scanlan had already been arrested. Similarly, Officer Giger was at Bagnell's house to investigate Bagnell's assault and gather evidence, not track down the assailant. Accordingly, this statement was testimonial.

-14-

On November 11, four days after Bagnell's assault, Detective Purcella met with Bagnell at his home. The purpose of her meeting was "to see injuries and things like that, how they had progressed, and check on [Bagnell] as well." During this meeting, Purcella saw Bagnell walking with a cane. She testified that she "asked him if that was typical for him, and he said that it was not and that he was using it as a result of the assault."

Here, again Detective Purcella's statement was testimonial because when viewed objectively, the primary purpose of a detective in her position would be to gather evidence for trial and "creat[e] an out-of-court substitute for trial testimony." Bryant, 562 U.S. at 358. There was no emergency when Detective Purcella asked Bagnell this question, and like Officer Giger, Purcella knew the identity of Bagnell's assailant.

We agree with Scanlan that the statements elicited through Detective Purcella and Officer Giger were testimonial. We disagree, however, that the introduction of the officers' statements requires reversal of Scanlan's assault and unlawful imprisonment convictions.

The harmless-error standard applies to confrontation clause errors. State v. Jasper, 174 Wn.2d 96, 117, 271 P.3d 876 (2012). Under this standard, the State must show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Jasper, 174 Wn.2d at 117.

> Whether such an error is harmless in a particular case depends upon a host of factors . . . includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). The reviewing court looks to the "untainted evidence to determine if it is so overwhelming that it necessarily leads to a finding of guilt." Hurtado, 173 Wn. App. at 608.

Here, any error was harmless. The improper testimony from Officer Giger and Detective Purcella was cumulative of other evidence of assault. Circumstantial evidence that Scanlan assaulted Bagnell was overwhelming. Scanlan was the only other person with Bagnell when he was found severely injured on November 6. In addition, Scanlan tacitly admitted that she assaulted Bagnell. A police officer testified at trial that when he pulled Scanlan out of the car she was hiding in, Bagnell's children yelled at her that "she had just beat her father half to death." The police officer testified that Scanlan shouted back, "It's not that bad." This is a tacit admission of guilt. In addition, Officer Giger and Detective Purcella's improper testimony did not affect the unlawful imprisonment charge.

*Sufficiency of the Evidence*

Scanlan next contends that there was insufficient evidence of her conviction for unlawful imprisonment.

When reviewing a claim for the sufficiency of the evidence, we consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (quotation omitted). "When the sufficiency of the evidence is challenged in a criminal case, all

reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." Salinas, 119 Wn.2d at 201. "Circumstantial evidence is as reliable as direct evidence." State v. Jackson, 145 Wn. App. 814, 818, 187 P.3d 321 (2008). "[I]nferences based on circumstantial evidence must be reasonable and cannot be based on speculation." State v. Vasquez, 178 Wn.2d 1, 16, 309 P.3d 318 (2013).

The State charged Scanlan with unlawful imprisonment under RCW 9A.40.040 which states: "A person is guilty of unlawful imprisonment if he or she knowingly restrains another person." To prove restraint, the State had to prove that Scanlan restricted Bagnell's movements "(a) without consent and (b) without legal authority, in a manner which interfered substantially with his liberty." State v. Warfield, 103 Wn. App. 152, 157, 5 P.3d 1280 (2000); RCW 9A.40.010(6). Restraint is without consent if it is accomplished by physical force, intimidation, or deception. RCW 9A.40.010(6).

There is sufficient evidence of unlawful imprisonment. First, Bagnell told Dr. Britt that "he had been in his home for two days, that he had been imprisoned, or at least held in his home, against his will." Physician's assistant Friel testified that Bagnell told her that Scanlan locked him in a room: "[h]e was living with a girlfriend at the time who had locked him in a room and had beat him with a candlestick, a broom, and a hammer over multiple areas."

Second, circumstantial evidence supports the inference that Scanlan used force or the threat of force to restrain Bagnell. Bagnell's children found the front door locked,

-17-

their father in a stupor, the house in disarray, and a broken broom, hammer, golf club, and crowbar. Bagnell's children were also unable to contact their father by phone. Additionally, Bagnell's cell phone was found broken, a battery was found to have been removed from a cordless phone in the home, and another phone was found to have no dial tone. Viewed in the light most favorable to the State, this is sufficient evidence of unlawful imprisonment.

Scanlan, relying on State v. Kinchen, 92 Wn. App. 442, 451-52, 963 P.2d 928 (1998), argues that there was insufficient evidence of unlawful imprisonment because there was a means of escape. In Kinchen, we held that there was insufficient evidence of unlawful imprisonment where the victims were able to get in and out of a locked apartment. 92 Wn. App. at 451-52. Stacey Kinchen locked his two badly behaved children in his apartment, but the boys were able to enter and exit the apartment through a window and, when it was unlocked, a sliding glass door. Kinchen, 92. Wn. App. at 444-45. Kinchen was convicted of unlawful imprisonment, but we reversed his conviction. We reasoned that there was insufficient evidence of unlawful imprisonment because the boys could and did get out. Kinchen, 92 Wn. App. at 451-52. We held that there was insufficient evidence to support a charge for unlawful imprisonment in the apartment. Kinchen, 92 Wn. App. at 452.

Scanlan's argument fails because there was evidence that Bagnell was held against his will: he told Dr. Britt that "he had been in his home for two days, that he had been imprisoned, or at least held in his home, against his will." We affirm Scanlan's conviction for unlawful imprisonment.

*Double Jeopardy*

Scanlan argues finally that her convictions for assault in the second degree and felony violation of a no-contact order violate double jeopardy because they are based on the same assaultive conduct. The State concedes this point. We accept the State's concession and remand for the imposition of a conviction for misdemeanor violation of a no-contact order and resentencing if necessary.

Otherwise we affirm Scanlan's conviction for second degree assault and unlawful imprisonment.

_____ Mann, J.

WE CONCUR:

_____

_____ Cox, J.