IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 35561-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| ANDREW JOHN SPRINT, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Andrew Sprint appeals his conviction for fourth degree assault of a child, his infant son. He also challenges the imposition of legal financial obligations. We affirm the conviction, but remand for a determination of whether to impose some of the financial obligations.

## FACTS

Andrew Sprint and Chalese Merritt begat a son, Charles, on February 3, 2014. Charles is a pseudonym. This appeal concerns Sprint's alleged assault on his son on April 16, 2014.

Andrew Sprint and Chalese Merritt met during a musical theatre production of Sweeney Todd. Sprint was eight years the senior to Merritt. The two began dating in April 2013 and engaged in sexual intercourse. Sprint and Merritt ended their brief

romance in July 2013, and the two had limited contact thereafter.  In October 2013,

Merritt learned that she conceived a child with Sprint.  She did not share the news with

Sprint.

As a 21-year-old prospective mother, Chalese Merritt arranged through Mike

Magnotti, a friend of both Merritt and Andrew Sprint, for her baby to be adopted.  On

February 3, 2014, Merritt gave birth to a healthy baby boy, Charles.  Magnotti phoned

Sprint the day of Charles' birth and informed him that he was a father.  Sprint

immediately signed pleadings agreeing to adoption, but he changed his mind later that

day and rescinded his signature on February 4.  When Merritt learned Sprint wanted to

raise Charles, she also decided to parent her son rather than consenting to adoption.

Charles went home with Merritt from the hospital.

Chalese Merritt resided with her parents, and Andrew Sprint visited Charles, in the

month after his birth, at the Merritt abode.  Sprint spent six to ten hours with Charles

every day.  On March 5, 2014, Sprint, by court order, obtained primary temporary

custody of Charles.  The custody order limited Merritt's visitation with Charles to ninety

minutes every other day.  Merritt typically retrieved Charles from Sprint's apartment and

took the infant to her parent's residence for visitation.

On April 16, 2014, when Charles was approximately nine weeks old, Andrew

Sprint called 911 to report a medical emergency with Charles.  Sprint reported to dispatch

that Charles was unconscious and limp, did not breathe right, had earlier turned the color

red, and now appeared pale. While on the phone with the 911 operator, Sprint observed that Charles' breathing had improved, but he remained unconscious. While being recorded, Sprint commented: "What's up, little guy? What hurts? What did papa do? What did papa do? I didn't — I don't know." Report of Proceedings (RP) (Aug. 15, 2017) at 1408.

Emergency medical technician (EMT) Kaila Brownlee and her work partner arrived via ambulance at Andrew Sprint's apartment and provided aid at the scene. When Brownlee assessed the situation, she observed no anomalies in Charles. Sprint spontaneously said to Brownlee: "Great, now I hope nobody thinks I shook my baby." RP (Aug. 7, 2017) at 167.

Andrew Sprint, as a precaution, directed Kaila Brownlee to transport Charles to Wenatchee's Central Washington Hospital. After arriving at the hospital, Charles underwent an absence seizure, and emergency nurses rushed him for a CT scan. An absence seizure differs from the typical seizure in that the patient does not shake, but becomes fixated with a blank expression. The CT scan revealed edema, subdural hematomas, and retinal hemorrhaging. Central Washington Hospital physicians anesthetized and intubated Charles for airlift to Seattle. Charles' lung collapsed during this procedure.

Before Charles flew to Seattle, Andrew Sprint, while at the hospital, spoke by phone with and texted his roommate, Justin Valdez. Valdez had occasionally, before

April 16, witnessed Sprint being rough with Charles. Valdez asked during a heated phone call: "What did you do?" Valdez added: "don't sling me that bullshit that you're not responsible for this." RP (Aug. 9, 2017) at 820. Sprint replied, "I can't say that I am or I'm not." RP (Aug. 9, 2017) at 820. According to Valdez:

> And then when he [Andrew Sprint] texted me, he says baby's got to get more tests, so I love him and I don't shake my baby. And prior to that, I didn't mention that I didn't—you know, I didn't accuse him of shaking the baby or anything like that, he just said that out of the blue.

RP (Aug. 9, 2017) at 821.

Seattle physicians saved Charles' life. Charles, however, suffers from permanent speech and mental deficits. The child wears a brace on his right arm.

PROCEDURE

The State of Washington charged Andrew Sprint with assault of a child in the first degree. The trial court found Sprint indigent and appointed a public defender. The superior court conducted a bench trial.

During trial, the State presented two medical witnesses, Dr. Rebecca Weister and Dr. Kenneth Feldman, from Seattle's Children's Hospital Child Protection Program, who cared for the child. Both opined that Charles' injuries did not occur spontaneously from a pre-existing defect, but resulted from abusive head trauma while in Andrew Sprint's care and control. Kenneth Feldman averred that the MRI revealed possible multiple injuries days or even weeks apart. Both doctors rejected the possibility of subdural rebleeds,

4

despite evidence that Charles may have experienced seizures before Sprint called 911 on April 16. Brittney Morrisey, Andrew Sprint's estranged girlfriend, and Chalese Merritt testified to Charles' staring to one side.

Dr. Kenneth Feldman, during trial, opined that injuries suffered by Charles occurred from a rotational acceleration. Nonetheless, he estimated that in eighty percent of medical cases of abusive head trauma, some other form of injury occurs beyond subdural hematoma, retinal hemorrhage, and brain injury. Feldman conceded that Charles suffered no bruising or external injury consistent with trauma.

Dr. Patrick David Barnes, Chief of Pediatric Neuroradiology at Lucille Packard Children's Hospital and a Professor of Radiology at Stanford School of Medicine, testified for Andrew Sprint. David Barnes concurred with Kenneth Feldman that both the CT scan and MRI revealed that a collection of blood in Charles' brain occurred days before April 16. Barnes explained the difficulty in assessing the timing of an acute or subacute hemorrhage from a CT scan, and he opined that a "recent" hemorrhage could be from three hours to ten days old. Dr. Barnes' analysis of the CT scans and MRIs did not rule out accidental trauma, birth trauma, or lack of oxygen from the failed intubation at the hospital. Barnes added that literature from the American Academy of Pediatrics deems a finding of neck injury to be an important method of confirming abusive head trauma. Charles' medical records showed no neck injury.

During trial, the State played the 911 audio tape. The trial court also heard

testimony from Justin Valdez, Andrew Sprint's roommate. Valdez testified about incidents wherein Sprint roughly burped Charles, yelled at the child for crying, and held Charles without using proper neck support. Valdez testified that he witnessed "days of [Sprint] being really rough with the baby." RP (Aug. 9, 2017) at 820. Valdez repeatedly used the word "free-floating" when describing Charles' head as Sprint held him under the arms. RP (Aug. 9, 2017) at 807-08. Valdez often confronted Sprint about mistreatment of Charles, and Sprint ignored the concerns.

Chalese Merritt and her mother, Melanie Merritt, testified at trial. Both expressed no concern that Andrew Sprint would harm Charles. Andrew Sprint's former and estranged girlfriend, Brittney Morrissey, testified that she observed Sprint care for his son and never saw any rough treatment of the son.

Andrew Sprint testified in his defense. He did not accuse anyone of hurting Charles. Sprint denied ever shaking, dropping, or slamming Charles. He admitted to being overwhelmed at times when Charles fussed and being frustrated with Chalese Merritt regarding her lack of care for their son.

Andrew Sprint, during his testimony, denied that he asked during the emergency call: "What did papa do?" He averred that he commented: "What does papa do?" RP (Aug. 15, 2017) at 1453.

The trial court acquitted Andrew Sprint of assault of a child in the first degree. The court instead found Sprint guilty of the lesser included offense of assault in the

6

fourth degree.

The trial court entered the following findings of fact and conclusions of law:

## II. FINDINGS OF FACT

The following facts were found beyond a reasonable doubt:

2.1 Andrew Sprint was the custodial parent of nine[-]week[-]old [Charles], when on April 16, 2014, [Charles] suffered injuries that caused him to have seizures, subdural hematoma, retinal hemorrhages, and swelling of the brain.

2.2 Medical testimony supports the court's finding that the injuries suffered by [Charles] occurred shortly before the 911 call and during the time when [Charles] was in Andrew Sprint's sole and immediate care and control.

2.3 While there was medical testimony from the defense experts that there may have been other possible causes for the injuries that were not, in their opinion, adequately explored, none of those experts ruled out abusive trauma.

2.4 The court finds that [Charles] suffered his injuries due to non-accidental trauma.

2.5 Andrew Sprint's unsolicited comments overheard during the 911 call of "What did papa do?", and to the emergency medical technician Kaila Brown[lee] of people thinking he "shook the baby["], and in a text message to his roommate Justin Valdez that "I don't shake my baby"; and his statement in a phone call to Mr. Valdez of "I can't say that I did, and I can't say that I didn't" in response to Mr. Valdez' question of whether Sprint caused the injuries—the court finds these statements to be tacit admissions by Sprint that he was the cause of [Charles's] injuries.

2.6 Andrew Sprint, on other occasions, was observed by Justin Valdez roughly and inappropriately handling the child, such as using too much force when burping the child, holding the child in the air without giving proper neck support, and yelling at the child for crying. Even though such prior actions did not cause injury to the child or a report of abuse by Mr. Valdez, this information supports the court's finding that Andrew Sprint intentionally assaulted [Charles].

2.7 Andrew Sprint intentionally assaulted [Charles][.]

2.8 The State did not prove beyond a reasonable doubt that Andrew Sprint either intentionally or recklessly caused the injuries. The court finds

7

that the injuries were negligently inflicted by Andrew Sprint's intentional assault.

### III. CONCLUSIONS OF LAW

3.1 Andrew Sprint intentionally assaulted [Charles]. The circumstances of this assault do not rise to the level of assault in the first, second, or third degree.

Clerk's Papers (CP) at 45-46.

The trial court sentenced Andrew Sprint to three hundred sixty four days' confinement with one hundred and eighty four suspended, contingent upon twenty-four months of supervision. One hundred and eight days' of actual confinement was ordered. During the sentencing hearing, the trial court heard from the prosecution, defense counsel, and Andrew Sprint about legal financial obligations and restitution. The prosecutor mentioned the payment of approximately $30,000 in restitution. The trial court scheduled a restitution hearing to occur two months later. Defense counsel remarked to the court that Sprint faced paying tens of thousands, if not hundreds of thousands of dollars, in restitution, presumably for medical bills. Counsel added that Sprint possesses a significant amount of money to pay.

During sentencing, Andrew Sprint commented that he worked during the last three years at a restaurant as a cook and for two months he performed electrical work. He mentioned the difficulty of finding employment with a pending felony. Sprint later remarked that he worked part time at the Bremerton Symphony and that the Innocence

Project of Washington offered him housing and employment.  Sprint claimed he had the ability to work to pay "any offending fees" ordered.  RP (Aug. 15, 2017) at 1474.

During sentencing, the trial court did not ask Andrew Sprint about his income at the symphony or his possible income at the Innocence Project.  The court did not inquire about Sprint's debt obligations.  The defense registered no objection to the imposition of legal financial obligations.

The trial court imposed a $200 criminal filing fee, a $500 crime victim assessment, a $250 fine, $400 for a court appointed attorney, and a $100 probation fee, for a total of $1,450 in legal financial obligations.  The court later imposed $30,021.55 in restitution.

After imposition of his sentence, Andrew Sprint informed the trial court that his financial status had not changed since the filing of charges.  The trial court again found Sprint indigent and determined he had a right to pursue his appeal at public expense.

LAW AND ANALYSIS

Sufficiency of Evidence

Andrew Sprint assigns error to his conviction and to the imposition of legal financial obligations.  As to his conviction, Sprint argues that insufficient evidence supported his conviction for fourth degree assault.  He claims, in part, that a conviction demands direct evidence of his harmfully touching Charles.  He challenges his statements to others as tacit admissions of harming Charles, and he faults the trial court for relying

on Justin Valdez's testimony of earlier behavior.  Sprint argues that reliance on his statements and Valdez's testimony constitutes mere speculation that cannot support a finding of harmful touching.  Conversely, the State contends that overwhelming circumstantial evidence supports the conviction.

When reviewing a claim for insufficiency of the evidence, this court asks whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980).  We draw all reasonable inferences from the evidence in favor of the prosecution and interpret the evidence most strongly against the defendant.  *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).  We deem circumstantial evidence as reliable as direct evidence.  *State v. Jackson*, 145 Wn. App. 814, 818, 187 P.3d 321 (2008).  The trier of fact may rely exclusively on circumstantial evidence to support its decision.  *State v. Jackson*, 145 Wn. App. at 818.  Nevertheless, inferences drawn from circumstantial evidence must be reasonable and cannot be based on speculation.  *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013).

The controlling statute, RCW 9A.36.041, declares:

> A person is guilty of assault in the fourth degree if, under circumstances not amounting to assault in the first, second, or third degree, or custodial assault, he or she assaults another.

Because the criminal code does not define assault, our courts apply common law

definitions of assault. *State v. Abuan*, 161 Wn. App. 135, 154, 257 P.3d 1 (2011).

Washington law recognizes three definitions of assault: (1) an unlawful touching with

criminal intent, (2) attempt, with unlawful force, to inflict bodily injury on another, and

(3) placing another in apprehension of harm. *State v. Jarvis*, 160 Wn. App. 111, 117-18,

246 P.3d 1280 (2011). The State relies on the first definition in the prosecution of

Andrew Sprint. The intent required for assault is simply the intent to make physical

contact with the person, not the intent that the contact be malicious or criminal. *State v.*

*Jarvis*, 160 Wn. App. at 119. Sprint cites no decision that requires direct evidence of a

striking of the victim in order to prove an unlawful touching with criminal intent.

In challenging his conviction, Andrew Sprint seeks to recharacterize some of the

testimony, on which the trial court relied. Sprint contends that he never asked: "What did

papa do?" while on the phone with emergency dispatch. He requests that we accept his

testimony that he said "What does papa do?" RP (Aug. 15, 2017) at 1453. Nevertheless,

the trial court, not us, determines the facts.

Andrew Sprint further argues that the record containing this disputed statement is

not transcribed and is indecipherable. Sprint cites to page 285 of the report of

proceedings. Sprint correctly notes that the word "(Indiscernible)," appears on that page.

Nevertheless, the 911 call played a second time during the State's closing argument

clearly broadcasted: "What's up, little guy? What hurts? What did papa do? What did

papa do?" RP (Aug. 15, 2017) at 1408. Thus, the trial court could reasonably conclude,

based on the evidence, that Sprint asked: "What did papa do?"

Andrew Sprint, relying on *State v. Scanlan*, 2 Wn. App. 2d 715, 733, 413 P.3d 82, *reviewed granted*, 191 Wn.2d 1026, 428 P.3d 1171 (2018), argues that he made no tacit admission of guilt when he asked: "What did papa do?" while on the line with 911. In *Scanlan*, a police officer testified at trial about a statement wherein the victim's children yelled to Theresa Scanlan that "she had just beat her father half to death," and Scanlan yelled back, "It's not that bad." *State v. Scanlan*, 2 Wn. App. 2d at 733. The court held that the defendant's statement constituted a tacit admission of guilt. Sprint argues that he made no such similar admission.

We know of no legal rule that defines what constitutes a tacit admission of guilt or of any legal test that assists in discerning a tacit admission. Andrew Sprint cites and proposes no rule or standard. Absent such a rule or test, we defer to the trier of fact as to what statements of an accused qualify as a tacit admission.

We note other possible tacit admissions by Andrew Sprint. Sprint answered Justin Valdez's question about what caused the injuries: "I can't say that I did, and I can't say that I didn't." CP at 45. Sprint, without any solicitation, commented to EMT Kaila Brownlee: "Great, now I hope nobody thinks I shook my baby." RP (Aug. 7, 2017) at 167. In his brief, Sprint posits his personal opinion as to why these statements were not tacit admissions. He provides no citation to authority to support the argument.

The trial court, as trier of fact, held the prerogative to determine whether Andrew

12

Sprint's statements constituted nonsensical panicked responses under extreme stress or whether the remarks acted as tacit admissions of guilt in causing Charles' serious injuries. The trier of fact assesses the weight, credibility, and inferences of testimony. *State v. Bencivenga*, 137 Wn.2d 703, 708-09, 974 P.2d 832 (1999).

Andrew Sprint argues that Justin Valdez's claim that Sprint roughly handled Charles does not establish that he harmfully touched Charles on April 16, 2014. He further contends that his own statements to the 911 operator, to Valdez, and to emergency medical technician Kaila Brownlee did not admit harmful touching.

While citing *State v. Hutton*, 7 Wn. App. 726, 728, 502 P.2d 1037 (1972), Andrew Sprint states that a fact cannot rest upon guess, speculation, or conjecture. According to Sprint, because Valdez did not witness Sprint touch Charles on April 16, Valdez's general opinion that Sprint was rough is not evidence of an assault on his child. Nevertheless, no decision requires direct proof of a harmful touching. Also, we do not need to decide whether Valdez's testimony, by itself, constitutes sufficient evidence to convict. Sprint's comments to others, his opportunity to harm Charles, and the lack of other caretakers provides additional circumstantial evidence to convict.

Finally, Andrew Sprint argues that the findings of fact elucidate a logical flaw in the court's conclusions of law. He contends that, without evidence of "what happened," the trial court cannot infer a mental state of negligence for assault in the fourth degree. Sprint emphasizes that the trial court agreed that it would only be guessing that Sprint

13

acted intentionally or recklessly when injuring Charles. In turn, the trial court would also be speculating whether Sprint acted negligently.

While the trial court, in its oral ruling and in the findings of fact, commented that Sprint was "negligent," the court did not need to find any mental state to convict Sprint of assault in the fourth degree. Unlike the requisite mental state that a defendant must intentionally or recklessly cause injury for an assault in the first and second degree, the intent required for assault in the fourth degree is simply the intent to make physical contact with the person, not the intent that the contact be a malicious or criminal act. *State v. Jarvis,* 160 Wn. App. at 119 (2011).

Ample evidence supports that Andrew Sprint had frequent physical contact with Charles and harmfully touched Charles. Charles was in Sprint's sole custody for the majority of the days leading up to the 911 call, and even Sprint's medical expert could not rule out abusive head trauma.

Andrew Sprint's trial court needed to rely heavily on circumstantial evidence. The court noted that only two people witnessed the conduct of Sprint: Sprint and Charles, who could not talk or testify. After viewing the evidence and listening to all of the witnesses, the trial court did not believe Sprint and felt that his testimony was not always truthful. The trial court, as finder of fact, relied on substantial evidence when convicting Andrew Sprint.

Legal Financial Obligations

Andrew Sprint assigns error to the trial court's imposition of legal financial obligations, while arguing that the sentencing court failed to adequately inquire into his ability to pay under *State v. Blazina*, 182 Wn.2d 827, 344 P.3d 680 (2015). The State answers that the sentencing court sufficiently inquired into Sprint's ability to pay financial obligations. The State also asks that we decline review of this second assignment of error because Sprint never objected to imposition of the obligations before the sentencing court. We exercise our discretion under *State v. Blazina*, 182 Wn.2d at 832, and address this assignment of error.

The trial court imposed a $200 criminal filing fee, a $500 crime victim assessment, a $250 fine, $400 for a court appointed attorney, and a $100 probation fee, for a total of $1,450 in legal financial obligations. The court later imposed $30,021.55 in restitution.

Andrew Sprint mistakenly labels the $250 fine as a discretionary legal financial obligation subject to his ability to pay. We disagree. This court has held that "a fine is not a court cost subject to the strictures of RCW 10.01.160(3) and the trial court is not required to conduct an inquiry into the defendant's ability to pay." *State v. Clark*, 191 Wn. App. 369, 376, 362 P.3d 309 (2015). Therefore, we affirm the $250 fine. We also affirm the nondiscretionary $500 crime victim assessment.

The 2018 Washington State Legislature adopted House Bill 1783 that transformed

15

the $200 criminal filing fee into a discretionary legal financial obligation to be imposed only if the defendant possesses the ability to pay. Our Supreme Court decided *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018) on September 20, 2018. The decision declares the statutory amendments found in House Bill 1783 to apply prospectively to cases on direct appeal at the time the amendment was enacted. *State v. Ramirez*, 191 Wn.2d at 747. The $400 court appointed attorney fee and the $100 probation fee always qualified as discretionary legal financial obligations.

Under RCW 10.01.160(3), the trial court is not authorized to order a defendant to pay discretionary costs unless he will be able to pay them. Accordingly, "a trial court has a statutory obligation to make an individualized inquiry into a defendant's current and future ability to pay before the court imposes" legal financial obligations. *State v. Blazina*, 182 Wn.2d at 830. Notably, "the court must do more than sign a judgment and sentence with boilerplate language stating that it engaged in the required inquiry." *State v. Blazina*, 182 Wn.2d at 838. The record must reflect that the trial court made an individualized inquiry into the defendant's current and future ability to pay, and the court must consider the defendant's other debts.

Andrew Sprint's sentencing court did not make an individualized inquiry into Andrew Sprint's current and future ability to pay. Sprint commented about a possible job and a current job, but the court did not inquire into Sprint's income from either job. The court knew of the high sum of restitution, but the court did not ask about Sprint's other

16

debts, if any. The trial court appointed public counsel to represent Sprint at trial, and the court later entered an order of indigency authorizing him to seek review at public expense. Because the record does not show that the sentencing court made an adequate inquiry into Sprint's ability to pay, we remand for a new sentencing hearing if the State chooses not to strike the $200 filing fee, the $400 attorney fees, and the $100 probation fee. If the State chooses to strike the three financial obligations, Andrew Sprint need not appear in court for any hearing to strike.

## CONCLUSION

We affirm Andrew Sprint's conviction for fourth degree assault of a child. We remand to the sentencing court to determine Andrew Sprint's ability to pay discretionary legal financial obligations.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Korsmo, J.

_____
Siddoway, J.

17