# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>RONALD DELESTER BURKE,<br><br>Appellant. | No. 50053-1-II<br><br><br><br>PUBLISHED OPINION |

JOHANSON, J. — Ronald Delester Burke appeals his jury trial conviction for second degree rape by forcible compulsion. He argues that (1) the admission of the now-deceased victim's testimonial statements to a sexual assault nurse examiner (SANE nurse) violated his right to confront the witness and (2) the trial court erred when it admitted the victim's statements to the SANE nurse under ER 803(a)(4) as statements made for the purpose of medical diagnosis or treatment. The parties also dispute whether the declarant-centric test established in *State v. Shafer*, 156 Wn.2d 381, 390 n.8, 128 P.3d 87 (2006), or the primary purposes test from *Ohio v. Clark*, ___ U.S. ___, 135 S. Ct. 2173, 192 L. Ed. 2d 306 (2015), and *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), applies to the confrontation clause claim.

We hold that (1) the primary purpose test applies to the constitutional claim, (2) the victim's statements to the SANE nurse were testimonial and violated the confrontation clause, and (3) the

error was not harmless under the constitutional harmless error standard. We do not reach the ER 803(a)(4) issue. Accordingly, we reverse.

FACTS

I. BACKGROUND

At 1:24 AM on July 3, 2009, KEH arrived at Tacoma General Hospital's emergency room and reported that she had just been raped in nearby Wright Park. KEH was intoxicated when she arrived at the hospital. She was homeless and was known to reside in or near Wright Park.

Social worker Bettye Craft contacted KEH about 20 minutes after KEH's arrival in the emergency room. KEH was crying, upset, and had leaves and grass in her hair. After KEH asserted that she had been raped, Craft contacted the police.

Tacoma Police Officer Khanh Phan contacted KEH in her room at about two hours after her arrival. According to Officer Phan, KEH was "extremely intoxicated" and "kind of incoherent." 8 Verbatim Report of Proceedings (VRP) at 838, 846-47. Although KEH was slurring her speech, Officer Phan could understand her if she spoke slowly. Officer Phan observed that KEH had dirt stains on her pants, but she did not appear to be injured.

KEH told Officer Phan that the incident had occurred near the restrooms at the park and gave a description of her attacker.[1] After interviewing KEH, Officer Phan went to Wright Park to examine the crime scene. Officer Phan did not find anyone matching the suspect's description or any evidence at the park.

---

[1] At trial, Officer Phan did not testify as to what this description was beyond stating that the suspect was a black male.

When the SANE nurse Kay Frey initially contacted KEH in the emergency room around 7:00 AM, Frey did not observe that KEH exhibited any impairment. Frey said that she would not be able to see KEH until later that day. KEH agreed to wait. According to Frey, KEH was able to speak, but she was tired.

At about 8:11 AM, registered nurse Carol Aquino-Smith spoke to KEH in the emergency room. KEH was sleeping when Aquino-Smith arrived, but when KEH awoke she appeared "alert and oriented." 7 VRP at 688. When Aquino-Smith asked KEH if she knew why she was in the hospital, KEH "stated she was [in the hospital] because she was raped last night in the park." 7 VRP at 689. KEH's blood test collected at about 7:45 AM, showed that her blood alcohol level was 0.160, approximately twice the legal limit for driving. A drug screening also showed that she had tetrahydrocannabinol (THC) in her system. But KEH did not appear to Aquino-Smith be under the influence of marijuana.

KEH was medically cleared to leave the emergency room at 11:13 AM. At this point, KEH had been examined by a physician, the appropriate testing had been ordered, and no further emergency room treatment was required. But KEH voluntarily remained in the hospital waiting to be examined by Frey.

At about 4:00 PM, Frey began the sexual assault forensic examination. Frey observed abrasions to KEH's left elbow and right knee, some redness on her left inner thigh, some abrasions or cuts on her vulva, and a laceration to the upper part of her cervix.

During the examination, Frey obtained a history from KEH. Frey later testified that the history was "like any medical history" and was a personal statement about what happened. 6 VRP at 607. KEH described the incident to Frey. And Frey collected samples that could contain

3

deoxyribonucleic acid (DNA) evidence and took KEH's underwear. The DNA evidence taken from KEH's underwear included female DNA that matched KEH and male DNA from sperm that did not match anyone known to law enforcement at that time.

In May 2011, the DNA was reevaluated and the male DNA matched Burke's DNA profile. When officers attempted to contact KEH about the DNA match, they learned that KEH had died of an unrelated illness in April 2011.

In September 2014, Tacoma Police Department Detectives Bradley Graham and Lindsey Wade interviewed Burke, who was in jail in eastern Washington. During this interview, Burke admitted to having lived in Tacoma in 2009 and to having visited Wright Park. But Burke denied having been to the park without his girlfriend, having had sexual intercourse with anyone in the park, or knowing why his DNA would be found at the scene of a sexual assault that occurred in the park in 2009.

## II. PROCEDURE

The State charged Burke with second degree rape by forcible compulsion. The case proceeded to a jury trial.

### A. MOTION TO ADMIT KEH'S STATEMENTS TO FREY

Because KEH was not available to testify, the State moved to admit KEH's statements to Frey under ER 803(a)(4), the medical exception to the hearsay rule. Burke responded that admission of these statements would violate his right to confrontation under *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

At the motion hearing, Frey testified that she was a SANE nurse and that she had examined KEH. When the State asked Frey what the purpose of the exam was, she testified that there were two purposes—a forensic purpose and a medical care purpose. Specifically, she testified,

> The purposes are to do the forensic piece: Photographing, taking a history, doing any DNA retrieval that could be done. Another purpose is to provide them with the medical care they need, subsequent to their assault, and provide support and connections for them via advocates and social workers and that kind of thing. So it's to basically manage their case.

6 VRP at 545. But Frey testified that she did not provide general medical care, only medical care "specific to their sexual assault." 6 VRP at 565.

Frey further testified that taking a history from the patient regarding what had happened was "probably the most important" part of the medical examination. 6 VRP at 545. When asked why it was so important, Frey responded,

> Well, this is just medical training in general. History guides everything, and that's true for sexual assault patients as well. So what they tell you, what they can tell you, what they aren't able to tell you, directs you further to what they might need, medically, to figure it out.

6 VRP at 545.

Frey further stated that the history she obtains from the patient can provide additional details about their case and can govern what medications are needed or where to look for injuries. She opined that a patient's "history" was "[a]bsolutely" vital and that it was "the tenet for healthcare in general." 6 VRP at 546. Frey testified that KEH's exam revealed an additional injury—the cervical laceration that required additional medical consultation.

Frey also testified that she was paid by the hospital, that she did not take direction from law enforcement, and that law enforcement was not present at the examination. But on cross-examination, Frey testified that the funding for the forensic examination was "supported through

crime victims associations" and that these funds included money from the federal government that was disbursed by the State. 6 VRP at 558.

Also on cross-examination, Burke introduced several exhibits that the trial court admitted for purposes of the hearing. The first exhibit, exhibit 19A, was the "[f]orensic [e]valuation" patient information sheet. This form contained four sections addressing (1) the emergency department information, (2) agency information, (3) discharge planning, and (4) post-assault follow up. The emergency department information included a notation that KEH had walked to the emergency room from Wright Park after being assaulted and that she was homeless. The agency information section noted that law enforcement had been contacted. The discharge planning section noted that KEH's homelessness was an "[i]mmediate [s]afety [c]oncern" and that she would need to establish a safety plan before being discharged. Ex. 19A.

Exhibit 19B was titled "consent for forensic evaluation and treatment." (Capitalization omitted.) In this form, KEH acknowledged the following statement: "I, [KEH], have come to Tacoma General . . . for a forensic evaluation to be performed by a Forensic Nurse Examiner and to include *documentation of the assault*, collection of evidence, *nursing care and treatment* limited to MultiCare Health System's Forensic Nurse Examiner nursing protocols." Ex. 19B (emphasis added). KEH further acknowledged that she understood that a medical screening examination and care had to first be provided by an emergency department or primary care provider and that "[a] forensic evaluation does not include general medical care." Ex. 19B.

The consent form then described several aspects of a forensic evaluation, including that "[m]edications may be recommended including immunizations, anti-nausea medications, emergency contraception and medications to treat sexually transmitted infections." Ex. 19B. This

section also advised KEH that if the case had been reported to law enforcement, Frey could speak to the investigating officer or others.

Exhibit 19B also stated, "The detailed medical records (*photographs, lab results, written documentation*) completed today will be kept confidential, secured at MultiCare Health System and may only be disclosed as allowed by law." The consent form included a request that all physical evidence collected during the evaluation be released to law enforcement investigating the reported assault.

Exhibit 19C was titled a "forensic evaluation: patient history." (Capitalization omitted.) In this form, Frey noted that the incident occurred in Wright Park. Frey further included KEH's description of the assailant, noting that he was tall, "light black," no or short hair, and was wearing jeans and a white t-shirt with no jacket. The form also included a matrix that allowed the examiner to check off various items related to the assault. The matrix showed that there was vaginal penetration of KEH's vagina by the assailant's penis. Frey also noted that KEH thought that "his penis was all the way in," that KEH did not think that the attacker had ejaculated, and that she was on the ground on her back during the assault. Ex. 19C.

Exhibit 19D was a continuation of the patient history. In this form, Frey noted that KEH reported a pain level of 5 out of 10 and that she had pain in her "vaginal area." Ex. 19D. The form also noted that KEH had said she had been "doing a bit of drinking" when the attack happened. Ex. 19D. It further reported that KEH said that although her attacker had not strangled her, "[h]e put his hand over [her] mouth," that he was "laying on [her]," and that he told her "'[t]o keep [her] mouth shut" and not to report the incident. Ex. 19D.

Exhibit 19E was a "patient narrative." (Capitalization omitted.) It stated,

[Frey]: "Can you tell me what happened in Wright Park?"
[KEH]: "I was sitting there rolling myself a cigarette. I know he covered my mouth because I would have been screaming for help. I was taken to the ground. I don't know if he tried choking me or not. The next think I knew I was taken to the ground, my pants were off and stuff and he was inside me. It was over and done with. I think he told me to keep my mouth shut. That's all I remember, then I came here. I walked over to the hospital."

Ex. 19 E.

Exhibit 19F, was a chart indicating where KEH's injuries were and describing injuries. This form also contained a brief description of KEH's "general physical appearance and demeanor." Ex. 19F. It stated, "Very slight & extremely thin. 2 layers of clothing—top layer crusted [with] dirt, esp. on bottom. Stayed for hours in [emergency department]—SANE nurse [with] another case—'because I don't want him to be out there doing this to someone else.'" Ex. 19F.

Exhibit 19G was a summary of the "examination information." (Capitalization omitted.) This form described KEH's injuries in more detail and noted that Frey had consulted with doctors about KEH's cervical laceration. The form noted that a consulting doctor advised letting the wound heal on its own and telling KEH to return to the emergency room if it continued to bleed.

Exhibit 19H, listed the physical evidence collected and described the chain of custody. It noted that the physical evidence was released to the Tacoma Police Department at 7:30 PM on July 3, 2009.

Exhibit 19I was an unsigned copy of the "discharge instructions for post-sexual assault." (Capitalization omitted.) This form advised KEH to return to the emergency department if bleeding continued and advised her to schedule follow-up appointments with Planned Parenthood for post-sexual assault evaluations. It also stated that if KEH's assault had been reported to the

police, the physical evidence would be transferred directly to the police department and noted that an advocate from the sexual assault center had been with KEH that day.

Noting that this was "a case of first impression," the trial court admitted KEH's statements to Frey as statements for the purpose of medical treatment because one purpose of the exam was to provide medical care. 6 VRP at 585. The trial court acknowledged that the examination had a dual purpose—a forensic purpose and a medical treatment purpose.

The trial court also acknowledged that KEH's death had created a confrontation right issue under *Crawford*. The court acknowledged that the exhibits introduced at the hearing discussed both medical care and a forensic evaluation that did not include medical care, but it focused on the last part of exhibit 19B, which it construed as allowing the release of the physical evidence collected only during the forensic examination. Ultimately, the trial court ruled that the statements relevant to the motion were not testimonial and, therefore, admissible.

## B. TESTIMONY

KEH's sister, Frey, Aquino-Smith, a forensic DNA analyst, Detectives Graham and Wade, Officer Phan, and the social worker testified for the State as described above. The trial court also admitted exhibits 19B, 19C, 19D, 19E, which are described above. Burke did not present any evidence.

During her testimony, Frey read KEH's narrative description of the incident verbatim to the jury from exhibit 19E quoted above.

Frey further testified about the information in the exhibits. Specifically, she testified that KEH stated that she had been on the ground on her back during the rape, that the man penetrated her vagina with his penis, that she did not think he had ejaculated, and that he did not wear a

9

condom. KEH also told Frey that her (KEH's) last consensual sexual act had been 15 years earlier. In addition, Frey testified that KEH had described her assailant as a tall, light-skinned black man, with short or no hair, who was wearing jeans and a white t-shirt but no jacket. And Frey testified that KEH also stated that she had come to the hospital because she did not want her attacker to do this to someone else.

Frey also testified about KEH's injuries. Frey stated that she observed (1) a fresh abrasion or scrape just under KEH's right knee that would "likely bruise later," (2) an abrasion on KEH's left elbow, (3) some redness on KEH's left inner thigh, (4) abrasions and cuts to the inside of KEH's vulva, and (5) a laceration to KEH's upper cervix that was still bleeding. 6 VRP at 629. Frey testified that the injuries to KEH's vulva could have been caused by either consensual or nonconsensual sex. But Frey testified that the cervical injury was rare and difficult to cause because the cervix is "a tough muscle." 6 VRP at 643. She opined that this injury was more consistent with nonconsensual, forcible intercourse.

On cross-examination, Frey testified that KEH was post-menopausal, that loss of estrogen as a result of menopause can result in less vaginal lubrication, and that this could result in a higher likelihood of vaginal injury. But Frey opined that being post-menopausal would not usually result in a higher incidence of injuries to the cervix.

Defense counsel also asked about the effect of cervical cancer. Frey testified that cervical cancer or an infection could make the cervix "more fragile." 6 VRP at 659. Defense counsel then presented evidence that when KEH died, she had "[e]nd-stage cervical cancer." 6 VRP at 660.

10

## C. CLOSING ARGUMENT

In its closing argument, the State quoted KEH's narrative statement to Frey. The State also relied on KEH's description of the assailant as related to Frey. In addition, the State discussed the statements KEH made to Frey and Frey's documentation of KEH's injuries. And although the State relied on the DNA match to identify KEH's attacker, the State also commented on the fact that Burke also matched KEH's description.

When discussing the forcible compulsion element, the State expressly relied on KEH's statement that her assailant had covered her mouth and took her to the ground. The State also argued that KEH's injuries were indicative of forcible compulsion.

In his closing argument, Burke admitted that the DNA evidence proved that Burke had had sex with KEH "at some time and place," but he argued that there was no evidence other than KEH's word that this occurred in Wright Park or that there was forcible compulsion. 9 VRP at 942. Burke also argued that given KEH's intoxication, it was possible that she had consensual sex with Burke and could not remember it. He also questioned the accuracy of KEH's statements because she had been highly intoxicated and had THC in her system. In addition, Burke argued that some of KEH's injuries could have been consistent with falling, that the injuries to KEH's vulva could be consistent with consensual sexual intercourse, and that the cervical injury could have been caused by consensual sex because the cervix was weakened by cancer and the fact that KEH was post-menopausal.

The jury found Burke guilty of second degree rape. Burke appeals his conviction.

ANALYSIS

CONFRONTATION CLAUSE

Burke argues that the admission of KEH's statements to Frey violated the confrontation clause.[2]  The State responds that the admission of KEH's statements did not implicate the confrontation clause because they were not testimonial.  The parties also dispute what test we should apply to determine whether KEH's statements were testimonial.  Burke argues that the declarant-centric test announced in *Shafer* applies.  The State argues that the primary purpose test from *Clark* and *Davis* applies.

We hold that (1) the primary purpose test applies, (2) KEH's statements to Frey were testimonial, and (3) the admission of KEH's narrative statements was not harmless beyond a reasonable doubt.

A.  GENERAL LEGAL PRINCIPLES

"The Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'"  *State v. Koslowski*, 166 Wn.2d 409, 417, 209 P.3d 479 (2009) (alterations in original) (quoting U.S. CONST. amend. VI). "The confrontation clause applies to the state courts through the Fourteenth Amendment."  *State v. Clark*, 139 Wn.2d 152, 157-58, 985 P.2d 377 (1999) (citing *Pointer v. Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965)).  The confrontation clause prohibits the "introduction of testimonial statements by a nontestifying witness, unless the witness is 'unavailable to testify, and

---

[2] Burke mentions both his federal Sixth Amendment rights and his Washington Constitution article I, section 22 rights to confront witnesses, but he fails to present any argument establishing that article I, section 22 provides greater protection than its federal counterpart.  Accordingly, we address this issue under only the Sixth Amendment.

the defendant had had a prior opportunity for cross-examination.'" *Clark*, 135 S. Ct. at 2179 (quoting *Crawford*, 541 U.S. at 54).

We review confrontation clause challenges de novo. *Koslowski*, 166 Wn.2d at 417. The State has the burden of establishing that the statements in question were nontestimonial. *Koslowski*, 166 Wn.2d at 417 n.3.

A violation of the confrontation clause is subject to harmless error. *See State v. Anderson*, 171 Wn.2d 764, 770, 254 P.3d 815 (2011). The State has the burden of establishing that the error is harmless beyond a reasonable doubt. *State v. Easter*, 130 Wn.2d 228, 242, 922 P.2d 1285 (1996). "A constitutional error is harmless if the appellate court is assured beyond a reasonable doubt that the jury verdict is unattributable to the error." *Anderson*, 171 Wn.2d at 770. To make this determination, we apply the "'overwhelming untainted evidence'" test by looking to the untainted evidence to determine whether it is so overwhelming it necessarily leads to a finding of guilt. *Anderson*, 171 Wn.2d at 770 (quoting *State v. Guloy*, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985)).

Burke and the State do not dispute that KEH was unavailable to testify or that Burke did not have a prior opportunity to cross-examine KEH. But they do dispute (1) what test we should apply to determine whether KEH's statements to Frey were testimonial and (2) whether KEH's statements to Frey were testimonial.

## B. TEST

Burke contends that because Frey is a "nongovernmental witness," the declarant-centric test from *Shafer* applies here. Opening Br. of Appellant at 11-12. The State responds that under

*Clark*, the primary purpose test from *Davis* applies. We hold that the proper test is the primary purpose test.

Division One of this court has recently addressed this issue in *State v. Scanlan*, 2 Wn. App. 2d 715, 413 P.3d 82, *review granted*, 428 P.3d 1171 (2018). In *Scanlan*, Division One adopted the primary purpose test from *Clark* and applied it to a victim's statements to a variety of medical providers. 2 Wn. App. 2d at 728-29. We agree with Division One.

1.    FEDERAL BACKGROUND

In *Crawford*, the United States Supreme Court held that hearsay statements made to law enforcement officials could violate the confrontation clause if the statements were deemed "testimonial," the declarant was unavailable to testify, and the defendant did not have a prior opportunity to cross-examine the declarant. 541 U.S. at 53-54, 59. The *Crawford* Court further held that statements by a witness during questioning at a police station were considered testimonial. 541 U.S. at 53. Unfortunately, the Court did not define what qualifies as a testimonial statement. *Crawford*, 541 U.S. at 68.

In 2006, in *Davis*, the Court addressed whether statements given to law enforcement officers or 911 operators, which the Court considered to "be agents of law enforcement when they conduct interrogations of 911 callers," were testimonial. 547 U.S. at 823 n.2. The *Davis* court set out the "primary purpose" test:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822. But the *Davis* Court expressly declined to address whether statements made to individuals other than law enforcement officials could implicate the confrontation clause. 547 U.S. at 823 n.2.

Then in 2011, the Supreme Court decided *Michigan v. Bryant*.[3] In *Bryant*, the Court clarified that the primary purpose test was an objective test that requires "[a]n objective analysis of the circumstances of an encounter and the statements and actions of the parties to it," rather than "the subjective or actual purpose of the individuals involved in a particular encounter." 562 U.S. at 360. But again, the *Bryant* Court declined to decide whether the same standard applied to statements made to persons who were not law enforcement officials. 562 U.S. at 357 n.3.

Finally, in 2015, the Supreme Court issued *Clark*. In *Clark*, the Court addressed whether the admission of a three-year-old victim's statements to his teachers violated the confrontation clause. 135 S. Ct. at 2181-82. In doing so, the Court finally addressed "whether statements to persons other than law enforcement officers are subject to the Confrontation Clause." *Clark*, 135 S. Ct. at 2181. The Court "decline[d] to adopt a categorical rule excluding" statements to individuals who are not law enforcement officers "from the Sixth Amendment's reach." *Clark*, 135 S. Ct. at 2181. Instead, the Court applied the primary purpose test to determine whether the declarant's "statements clearly were not made with the primary purpose of creating evidence for [the defendant's] prosecution." *Clark*, 135 S. Ct. at 2181.

The *Clark* Court emphasized that courts must examine the challenged statements "in light of all the circumstances, viewed objectively" and that part of that context is the identity of the

---

[3] 562 U.S. 344, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011).

person to whom the declarant was speaking. 135 S. Ct. at 2180. The Court further noted, "Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." *Clark*, 135 S. Ct. at 2182.

In addition, the Court stated that "the primary purpose test is a necessary, but not always sufficient, condition for the exclusion of out-of-court statements under the Confrontation Clause." 135 S. Ct. at 2180-81. In situations where the primary purpose test suggests that the statement was testimonial, courts must still evaluate whether the statement was an "out-of-court statement[ ] that would have been admissible . . . at the time of the founding [of the Country]." *Clark*, 135 S. Ct. at 2180-81; *see Mattox v. United States*, 156 U.S. 237, 243, 15 S. Ct. 337, 39 L. Ed. 409 (1895) ("We are bound to interpret the constitution in light of the law as it existed at the time it was adopted."). The Court did not, however, apply this portion of the test because it held that the statements at issue were not testimonial.

2.      WASHINGTON BACKGROUND

Meanwhile, in 2006, our Supreme Court decided *Shafer*. In *Shafer*, the court addressed whether statements by a three-year-old rape victim to individuals not related to law enforcement were testimonial. 156 Wn.2d at 389-90. The *Shafer* court stated,

> The proper test to be applied in determining whether the declarant intended to bear testimony against the accused is whether a reasonable person in the declarant's position would anticipate his or her statement being used against the accused in investigating and prosecuting the alleged crime. The inquiry focuses on the declarant's intent by evaluating the specific circumstances in which the out-of-court statement was made.

156 Wn.2d at 390 n.8.

16

Most recently, Division One decided *Scanlan*. In *Scanlan*, Division One rejected *Schafer*'s declarant-centric approach and held that in light of *Clark* we must now apply the primary purpose test to statements made to individuals who are not related to law enforcement. 2 Wn. App. 2d at 725. The court noted that rather than focus on the declarant's subjective intent, the primary purpose test examines whether the circumstances as a whole objectively demonstrate there is no ongoing emergency and that the primary purpose of the questioning is to obtain evidence that will potentially be relevant in a later criminal proceeding. *Scanlan*, 2 Wn. App. 2d at 728. Notably, the *Scanlan* court did not address whether the type of statements at issue in that case would have been admissible at the time of the founding, possibly because it determined that the statements at issue were not testimonial.

3. DISCUSSION

As Division One recognized in *Scanlan*, *Clark* expressly examined how to determine whether a statement to an individual who is not a law enforcement officer is a testimonial statement. 135 S. Ct. 2181-82. Before *Clark*, the Supreme Court had issued no guidance on this matter, and *Schafer* was how this State decided to examine whether statements to nonlaw enforcement-related individuals were to be treated. But *Clark* now offers direct guidance on how to evaluate a federal confrontation clause claim involving statements made to individuals who are not law enforcement officers.

Because *Clark* offers new federal guidance on how to evaluate a federal confrontation clause claim when the declarant's statement is made to a nonlaw enforcement-related individual, and "[o]n matters of federal law, we are bound by the decisions of the United States Supreme Court," we adopt the same reasoning as *Scanlan* and follow the primary purpose test in this case.

17

*W.G. Clark Constr. Co. v. Pac. Nw. Reg'l Council of Carpenters*, 180 Wn.2d 54, 62, 322 P.3d 1207 (2014).

### C.  APPLICATION OF PRIMARY PURPOSE TEST

Under the primary purpose test, a declarant's statements are testimonial if they are made under circumstances that *objectively* demonstrate "that the primary purpose of the [questioning] is to establish or prove past events potentially relevant to later criminal prosecution."  *Davis*, 547 U.S. at 822.  In evaluating the primary purpose, the court objectively evaluates the circumstances of the encounter and the statements in context, including, but not limited to, whether there was an ongoing emergency, where the interview took place, the formality or informality of the interrogation, and the identity of the person to whom the declarant was speaking.  *Clark*, 135 S. Ct. at 2180.  "Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers."  *Clark*, 135 S. Ct. at 2182.

Here, even presuming that Frey was not directly acting for law enforcement,[4] the record[5] shows that KEH's statements were made under circumstances that objectively demonstrate that the primary purpose of the exam was to provide evidence for a criminal prosecution.

First, the examination had a forensic component and would be used as evidence even though Frey's examination had a medical treatment and diagnosis component.  Not only did Frey testify that the exam and questioning had a forensic component, the consent form that KEH signed

---

[4] Neither party asserts that Frey was a law enforcement official.

[5] Because we are addressing whether KEH's statements to Frey were admissible, the relevant facts in this analysis are drawn from the evidence presented at the motion hearing.

stated that the exam was a "forensic evaluation" that would "include *documentation of the assault* [and] collection of evidence."[6] Ex. 19B (emphasis added). And since the case had been reported to law enforcement, the consent form authorized Frey to talk to the investigating officers about the case.

Second, the record does not show that Frey was gathering this information in response to an ongoing emergency. The exam took place several hours after KEH's emergency room treatment was complete and after KEH was safely in the hospital and had already spoken to law enforcement officers. In fact, KEH was medically cleared from the emergency room several hours before Frey started her exam.

Third, even though Frey did not work directly for law enforcement and was paid by the hospital, her role, unlike the teachers in *Clark*, clearly had a law enforcement component because part of Frey's job was to collect evidence that would potentially be used by law enforcement. In fact, Frey testified that the forensic testing was paid for by government funds related to crime victim support.

Finally, there was evidence that KEH understood that the information she gave Frey would be used by law enforcement. In fact, KEH agreed to stay in the hospital for several hours specifically so Frey could examine her because KEH did not want her attacker "'to be out there doing this to someone else.'" Ex. 19F. Although KEH's subjective intent is not relevant to the primary purposes test, KEH's understanding that the exam could assist in preventing further harm

---

[6] The discharge instructions also stated that if the incident had been reported to the police, the physical evidence collected would be sent directly to the police department. But KEH did not sign the discharge form, so it is unclear if she received it.

corroborates the other objective evidence that the primary purpose of the exam was to establish or to prove past events potentially relevant to later criminal prosecution.

Despite Frey's exam having a medical treatment and diagnosis component, the objective facts demonstrate that the primary purpose of the examination was to provide evidence. Because the circumstances objectively suggest that the primary purpose of the exam and KEH's statements during the exam was to provide evidence, we hold that the State fails to establish that KEH's statements to Frey were nontestimonial.

We must next address whether the statements were the type of out-of-court statement that would have been admissible at the time of the founding. *Clark*, 135 S. Ct. at 2180-81. It is the State's burden to establish that KEH's statements were not testimonial. *Koslowski*, 166 Wn.2d at 417 n.3. The State does not address this factor. Thus, the State does not carry its burden on this factor.

Because the State fails to show that KEH's statements were nontestimonial and the State does not show that KEH's statements were the type of out-of-court statement that would have been admissible at the time of our country's founding, we hold that the admission of KEH's statements to Frey violated the confrontation clause.

## D.  CONSTITUTIONAL HARMLESS ERROR

We must next address whether this evidence was harmless under the constitutional harmless error standard. The State has the burden of establishing harmless error beyond a reasonable doubt. *Easter*, 130 Wn.2d at 242. "A constitutional error is harmless if the appellate court is assured beyond a reasonable doubt that the jury verdict is unattributable to the error."

*Anderson*, 171 Wn.2d at 770. The court must examine whether the untainted evidence is so overwhelming it necessarily leads to a finding of guilt.[7] *Anderson*, 171 Wn.2d at 770.

The State had to prove that Burke committed the rape by forcible compulsion. RCW 9A.44.050(1)(a). "'Forcible compulsion' means physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to herself or himself or another person, or in fear that she or he or another person will be kidnapped." RCW 9A.44.010(6). "Forcible compulsion requires more than the force normally used to achieve sexual intercourse or sexual contact." *State v. Ritola*, 63 Wn. App. 252, 817 P.2d 1390 (1991).

KEH's statements that she would have screamed but her assailant placed his hand over her mouth, that her attacker took her to the ground, and that her attacker lay on her was the key evidence of forcible compulsion—and the State heavily relied on this evidence when it discussed the forcible compulsion element in closing argument. The only other evidence that was arguably relevant to the forcible compulsion element was (1) the leaves and grass in KEH's hair, (2) the dirt on her outer layer of clothing, (3) the abrasions on her right knee and left elbow, (4) the redness on her left inner thigh, (5) the abrasions and cuts to the inside of her vulva, and (6) the cervical laceration.

But the leaves and grass in KEH's hair and her dirty outer layer of clothing could have been explained by the fact that she was homeless and lived outside and could have been consistent with consensual sex outside. And the injuries to her arms and knees could have been caused by a fall while she was intoxicated. The bruises to her thighs and the abrasions and cuts to the inside

---

[7] To determine if the untainted evidence was overwhelming, we must examine the evidence presented at trial, not the evidence presented at the motion hearing.

of KEH's vulva were certainly more indicative of sexual activity, but Frey testified that those injuries could have been caused by either consensual or nonconsensual sexual intercourse.

Other than KEH's narrative statement and her statements about what happened during the incident, the strongest evidence of forcible compulsion was KEH's cervical laceration. But although Frey testified that the cervical laceration was more consistent with forcible, nonconsensual intercourse, there was also evidence that it was possible that KEH's cervix may have been more vulnerable to injury because she was post-menopausal and that she could have had a weakened cervix due to cervical cancer.

Given the other possible explanations for KEH's injuries, we cannot say beyond a reasonable doubt that the admission of KEH's statements—that she would have screamed if her assailant had not placed his hand over her mouth, that he pushed her to the ground, and that he lay on her—did not influence the jury's decision as to the forcible compulsion element. Thus, we hold that the error was not harmless beyond a reasonable doubt.[8]

We hold that the admission of KEH's statements to Frey violated the confrontation clause and that this error was not harmless beyond a reasonable doubt. Because we reverse on this ground, we do not reach the ER 803(a)(4) issue.[9] Accordingly, we reverse Burkes's conviction and remand for further proceedings.

---

[8] Because we hold that KEH's statements related to forcible compulsion are not harmless and that alone is grounds for reversal, we do not address whether the other statements KEH made to Frey were harmless.

[9] For this same reason, we do not address the legal financial obligation issues that Burke raised in supplemental briefing.

No. 50053-1-II

CONCLUSION

We adopt the primary purpose test, reverse the conviction based on the confrontation clause

violation issue, and do not reach the ER 803(a)(4) issue.

JOHANSON, J.

We concur:

WORSWICK, P.J.

MELNICK, J.

23