# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON , <br><br> Respondent, <br><br> v. <br><br> EBRIMA DARBOE, <br><br> Appellant. | DIVISION ONE <br><br> No. 77833-1-I <br><br> UNPUBLISHED OPINION <br><br> FILED: April 15, 2019 |

DWYER, J. — Ebrima Darboe was tried and convicted by jury verdict of identity theft in the second degree, theft in the second degree—access device, vehicle prowling, and bail jumping. He appeals, asserting that the trial court erroneously denied a requested missing witness jury instruction, allowed the admission of testimonial hearsay in violation of his Sixth Amendment rights, erroneously declined to grant a first-time offender waiver at his sentencing, and imposed certain legal financial obligations in violation of current law. While we find his first three contentions to be without merit, we remand for amendment of his judgment and sentence to delete the requirement that he pay a criminal filing fee.

I

Hurnake Johal left his wallet, which contained his driver's license, credit and debit cards, and other personal items, in his vehicle. His son borrowed the vehicle and parked it in the parking lot at the LA Fitness in Mill Creek. While his son was inside the gymnasium, one of the vehicle's windows was shattered by a thief, who removed Johal's wallet, cash, and a phone charging cable.

Justin Taylor, a bystander, witnessed the theft and reported it to the police. Officer Christine White of the Mill Creek Police Department arrived at the scene and observed shattered glass both inside and outside of Johal's vehicle. Officer White used the license plate number to determine that the vehicle belonged to Johal. She also spoke with Taylor, who said that he had seen the break-in occur and saw the thief fleeing in a white Jeep. He provided Officer White with the Jeep's license plate number.

Officer White researched the Jeep's license plate number and determined that it was registered to Ebrima Darboe.

After Johal's son exited the gymnasium, he met with Officer White, saw the broken window, and contacted his father. Johal then contacted the banks that had issued his credit cards to report the theft. He was informed that his credit cards had already been used.

Johal went to the scene of the theft. Once there, Officer White informed him that, in her experience, a thief will generally use stolen credit cards quickly to make fraudulent purchases. Johal confirmed that he had been provided with a list of unauthorized transactions by the cards' issuing banks. Johal reviewed a

- 2 -

list of fraudulent transactions with the police that involved specific purchases on multiple of his credit cards.

The next day, Detective Tara Hoflack continued the Mill Creek Police Department's investigation. She obtained surveillance video from several stores documenting fraudulent use of the credit cards. Officers thereafter located Darboe's Jeep, had it towed to the police station, and applied for a search warrant.

That afternoon, Darboe called the police to report the Jeep as stolen. Detective Hoflack responded and met him in the parking lot adjacent to his apartment complex. When Hoflack told him that she was investigating fraudulent charges made on stolen credit cards, Darboe stated that his friend "Jaba" had borrowed the Jeep and returned it in the early morning.

During their conversation, Hoflack noticed Darboe's distinctive clothing: black jeans with a white T-shirt, a Seattle Seahawks cap with a reflective sticker on the brim, and teal, high-top Nike sneakers. Darboe stated that Jaba had been wearing the same clothes the previous night and had given them to Darboe as a gift for letting him borrow the Jeep. Later review of the security footage from stores where the fraudulent transactions were recorded showed Darboe wearing these clothes. Police also determined that the time stamps in security footage of Darboe's transactions matched the recorded time of fraudulent purchases reported by Johal and the issuing banks.

Searching the Jeep, Detective Hoflack and Detective Tyrone Hughes observed that the vehicle's license plate was placed upside down in the front

window, similar to the positioning of the plate in a security video from the night before. Hughes also noted the presence of a phone charging cable.

Subsequently, Darboe was arrested. Darboe was charged with identity theft in the second degree; an amended information added seven more counts of identity theft in the second degree, three counts of theft in the second degree—access device, a count of vehicle prowling, and a count of felony bail jumping.

Before trial, the State subpoenaed Justin Taylor and contacted him and his parents, with whom he lived, in an attempt to ensure that he would be able to testify as to what he had seen. While the prosecuting attorney stated that Taylor's appearance was not optional, he also informed Taylor's family that he would probably not be arrested solely for ignoring the subpoena. On the day Taylor was supposed to testify, his parents informed the prosecutor that he had gone hunting. Taylor was unreachable by telephone. He did not testify. The trial court allowed Officer White to relate Taylor's statement about the Jeep's license plate number in her testimony, ruling that the statement was not being offered for the truth of the matter asserted.

At the close of trial, Darboe requested that the jury receive a "missing witness" instruction, which would expressly allow the jury to infer that Taylor's testimony would have been damaging to the State's case. The trial court denied this request.

Ultimately, Darboe was convicted on all charges. The trial court imposed standard range sentences of 50 months on each identity theft conviction, 22 months for each conviction of theft of an access device, 51 months for bail

jumping, and a suspended sentence for vehicle prowling. The actual term of confinement imposed was 51 months. He now appeals.

II

Darboe first contends that the trial court abused its discretion by denying his request for a missing witness instruction. Darboe asserts that, because the State did not call Taylor as a witness, he was entitled to an instruction that the jury could infer that Taylor's testimony would have been unfavorable to the State's case against him. We disagree.

A trial court's refusal to issue a requested instruction, when based on the evidence in the case, is reviewed for abuse of discretion. State v. Walker, 136 Wn.2d 767, 771-72, 966 P.2d 883 (1998). A trial court abuses its discretion only when its decision is "manifestly unreasonable or based upon untenable grounds or reasons." State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995).

A missing witness instruction informs the jury that it may infer from a witness's absence at trial that his or her testimony would have been unfavorable to the party who would have logically called that witness. State v. Flora, 160 Wn. App. 549, 556, 249 P.3d 188 (2011). Such an instruction is proper when the witness is peculiarly available to one of the parties, Flora, 160 Wn. App. at 556, and the circumstances at trial establish that, as a matter of reasonable probability, the party would not have knowingly failed to call the witness "unless the witness's testimony would be damaging." State v. Davis, 73 Wn.2d 271, 280, 438 P.2d 185 (1968), overruled on other grounds by State v. Abdulle, 174 Wn.2d 411, 275 P.3d 1113 (2012). However, no such inference is warranted when the

witness is unimportant or the testimony would be cumulative. State v. Blair, 117 Wn.2d 479, 489, 816 P.2d 718 (1991). The party against whom the missing witness rule would operate is also entitled to explain that witness's absence to the court and thereby avoid operation of the inference. Blair, 117 Wn.2d at 489; accord State v. Montgomery, 163 Wn.2d 577, 599, 183 P.3d 267 (2008).

Whether a witness is peculiarly available to a party depends upon the nature of the relationship between the witness and that party. Davis, 73 Wn.2d at 277. In Davis, the court determined that an uncalled witness, a member of the law enforcement agency that had investigated the defendant, "worked so closely and continually with the county prosecutor's office with respect to this and other criminal cases as to indicate a community of interest between the prosecutor and the uncalled witness." 73 Wn.2d at 278. Similarly, in Blair, the court determined that missing witnesses were peculiarly available to the defendant when the names of the witnesses—with whom the defendant had both personal and business relationships—were "known to defendant alone." 117 Wn.2d at 490.

Here, the trial court did not abuse its discretion by refusing to give a missing witness instruction. First, Taylor was not shown to have been peculiarly available to the State. A witness is not peculiarly available merely by virtue of being subject to the subpoena power. Blair, 117 Wn.2d at 490. Rather, as our state Supreme Court has explained:

> For a witness to be "available" to one party to an action, there must have been *such a community of interest* between the party and the witness, or the party must have *so superior an opportunity* for knowledge of a witness, as in ordinary experience would have made it reasonably probable that the witness would

have been called to testify for such party except for the fact that his testimony would have been damaging.

Davis, 73 Wn.2d at 277 (emphasis added).

Here, in contrast, Taylor had no professional relationship with the prosecutor. Indeed, Darboe's attorney conceded that "Mr. Taylor . . . is not peculiarly available to the State, given he is not law enforcement." The parties had equal access to witness information.

The State subpoenaed Taylor, whose parents confirmed his receipt of the subpoena. The prosecutor called Taylor's parents at least three times in an attempt to ensure that Taylor would be available to testify at trial. The prosecutor told them that the subpoena meant that failure to appear was "not an option." The fact that the prosecutor admitted that the State would probably not direct its limited resources to arrest Taylor for failure to comply with the subpoena does not negate the fact that he was equally available to both parties.

The reason that Taylor was not called to testify was satisfactorily explained on the record. The prosecutor explained to the trial court the efforts made to secure Taylor's testimony, that Taylor had appeared at the prosecutor's office for an interview, and that the prosecutor thought that Taylor would be present to testify at trial. Further, the prosecutor stated that much of his communication with Taylor had been facilitated by Taylor's parents, who informed him of Taylor's decision to leave for a camping and hunting excursion, and that Taylor was without telephone reception. The record thus shows that the State made a good faith effort to ensure that Taylor would be available at trial, an

effort that failed solely due to Taylor's unilateral decision, which was satisfactorily explained to the trial judge.

The trial court had these facts before it when it determined not to give the missing witness instruction, concluding that Taylor was not "peculiarly available" to the State and that his absence was explained. These were tenable grounds for the court's decision. Thus, there was no abuse of discretion.

III

Darboe next contends that Taylor's statements to the police, in which he offered a description of Darboe's vehicle and license plate number constituted testimonial hearsay. Thus, he avers, testimony as to the statements violated his confrontation clause rights. The State responds that Taylor's comments were not offered for their truth, that they were thus not testimonial, and that, even if the statements were testimonial, their admission was harmless error in light of the abundant other evidence that Darboe committed the crime. Because the trial court correctly concluded that the statements were not offered for the truth of the matters asserted, there was no error.

We review de novo an alleged violation of the confrontation clause. State v. Koslowski, 166 Wn.2d 409, 417, 209 P.3d 479 (2009). The confrontation clause bars the admission of "testimonial" hearsay in criminal trials unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination. U.S. CONST. amend. VI; WASH. CONST. art. 1, § 22; Crawford v. Washington, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Hearsay is defined as "a statement, other than one made by the declarant while

testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). The confrontation clause does not preclude the use of testimonial statements for purposes other than establishing the truth of the matter asserted. Crawford, 541 U.S. at 60 n.9 (citing Tennessee v. Street, 471 U.S. 409, 414, 105 S. Ct. 2078, 85 L. Ed. 2d 425 (1985)).

"Testimony" has been defined as "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" Crawford, 541 U.S. at 51 (alteration in original) (quoting 2 N. WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)). Whether a statement is testimonial is determined by "whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" Ohio v. Clark, ___ U.S. ___, 135 S. Ct. 2173, 2180, 192 L. Ed. 2d 306 (2015) (alteration in original) (quoting Michigan v. Bryant, 562 U.S. 344, 358, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011)).

Among the factors employed in determining this primary purpose are whether the statement is made to assist in response to an ongoing emergency and the informality of the situation in which the interrogation took place. State v. Burke, ___ Wn. App. 2d ___, 431 P.3d 1109, 1118 (2018) (citing Clark, 135 S. Ct. at 1280). Neither factor, however, conclusively establishes the primary purpose of a conversation. Bryant, 562 U.S. at 366.

It is reasonable to infer that the primary purpose of Taylor's statements were testimonial. An objective evaluation of the "circumstances in which the encounter occurs and the statements and actions of the parties" demonstrates

that the primary purpose of Officer White's investigation was not to meet an ongoing emergency. Bryant, 562 U.S. at 359. The record does not indicate that the vehicular break-in was occurring in the same instant as Taylor's initial telephone call to the police. The only ongoing emergency was the unauthorized use of Johal's credit cards, which Officer White addressed by informing Johal of the break-in and advising him of appropriate steps to take. Darboe, having left the scene, did not pose a physical threat to Taylor, Johal, or Officer White.

Although Officer White's conversation with Taylor may have been informal and took place at the scene of the crime, "informality does not necessarily indicate the presence of an emergency or the lack of testimonial intent." Bryant, 562 U.S. at 366. The other circumstances existing at the time of the conversation clearly indicate that the statements concerning the description and license plate number of Darboe's vehicle were not made to assist in addressing an ongoing emergency but to obtain evidence potentially relevant in a later criminal proceeding.

Determining that the statements' primary purpose was testimonial, however, does not end our inquiry. To give rise to a confrontation clause violation, the statements must also have been offered for their truth. Crawford, 541 U.S. at 60 n.9. The record indicates that Taylor's statements were not offered to prove that Darboe was the person who drove to the LA Fitness parking lot and broke into Johal's vehicle. Rather, they were offered to show why Officer White took the subsequent investigative steps that were undertaken.

Darboe's confrontation clause rights were not violated. There was no error.

IV

In calculating the standard sentence range for a felony offense, the sentencing court must consider the defendant's criminal history and the seriousness of the criminal offense. RCW 9.94A.505(1), (2)(a), .510. However, the first-time offender waiver statute, RCW 9.94A.650, provides, in pertinent part, "In sentencing a first-time offender the court *may* waive the imposition of a sentence within the standard sentence range." RCW 9.94A.650(2) (emphasis added). Whether to grant a request for a first-time offender waiver sentence is thus discretionary. State v. Johnson, 97 Wn. App. 679, 682, 988 P.2d 460 (1999). However, "where a defendant has requested a sentencing alternative authorized by statute, the categorical refusal to consider the sentence, or the refusal to consider it for a class of offenders, is effectively a failure to exercise discretion and is subject to reversal." State v. Grayson, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005).

Darboe contends that the trial court denied his request for a first time offender waiver based only on "the seriousness level of the offense" and his failure to show that he would benefit from treatment or community custody. In doing so, he misstates the trial court's ruling. With regard to Darboe's request for the waiver, the trial judge stated:

> First time offender waivers from my perspective can be an
> appropriate sentence structure for an individual when that individual
> benefits from some opportunities of counseling or treatment or have

some other means of community restitution that are inconsistent with the more traditional means of being held accountable for a time, that means time in custody or prison or jail. The seriousness of these offenses are not consistent with either [the] policy of first time offender waiver[s] as I understand it, or my practice of allowing first time offender waivers for individuals.

These statements indicate that the trial court did not categorically refuse to grant the waiver based on the mechanical application of an arbitrary rule. Rather, the court carefully considered Darboe's personal situation, weighed the benefits of granting his request, and concluded that a standard range sentence was more appropriate. Darboe's offender score after his convictions was 10— serious enough to be a tenable basis for the trial court to rule out the requested alternative. Thus, the trial court did not abuse its discretion. There was no error.

V

The statute in effect at the time of Darboe's sentencing, former RCW 36.18.020(2)(h), provided for the mandatory assessment of a $200 filing fee upon a criminal's conviction or plea of guilty. This was amended effective June 7, 2018, to exclude indigent defendants from its scope. These changes are applied retroactively. State v. Ramirez, 191 Wn.2d 732, 747, 426 P.3d 714 (2018). Darboe asks that we remand to strike the filing fee. The State concedes that this is necessary. Thus, we remand for amendment of the judgment and sentence to strike the filing fee.

Affirmed in part and remanded.

WE CONCUR: